UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WILLIAM RICHARDSON,

                    Petitioner,

        v.                                   9:05-CV-1419
                                              (GTS/GHL)

DALE ARTUS,

                    Respondent.

_____

APPEARANCES:                          OF COUNSEL:

WILLIAM RICHARDSON
02-A-4024
Petitioner *pro se*
Clinton Correctional Facility
P.O. Box 2002
Dannemora, New York 12929

HON. ANDREW M. CUOMO            ALYSON J. GILL, ESQ.
Office of the Attorney General         Assistant Attorney General
State of New York
Counsel for Respondent
120 Broadway
New York, New York 10271

GEORGE H. LOWE, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION & ORDER</u>[1]

      Petitioner William Richardson, *pro se*, is an inmate in the custody of the New York State

Department of Correctional Services.  After a jury trial in June of 2002 in the County Court of

Rensselaer County, Petitioner was found guilty of Burglary in the First Degree (2 counts), Criminal

Possession of a Weapon in the Second Degree, Assault in the Second Degree, Reckless

---

[1] This action has been referred to the undersigned by District Court Judge Glenn T. Suddaby for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3(c).

Endangerment in the First Degree, and Criminal Use of a Firearm in the First Degree.[2]  06/21/02

Trial Tr. at pp. 150-51.  Petitioner was sentenced to concurrent terms of 25 years for both burglary

counts, 15 years for the criminal possession of a weapon count, 7 years for the assault count, 3 ½ - 7

years for the reckless endangerment count, and 25 years for the criminal use of a firearm count.

07/10/02 Sentencing Transcript, at pp. 28-29.

Petitioner's conviction was affirmed by the Appellate Division, Third Department, and leave

to appeal to the Court of Appeals was denied.  *People v. Richardson*, 9 A.D.3d 783 (N.Y. App. Div.

2004); *leave denied* 3 N.Y.3d 680 (2004).

Petitioner petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on

the following grounds: (1) Physical evidence was illegally obtained; (2) There was no independent

basis for the victim's in-court identification of Petitioner; and (3) The prosecutor committed

misconduct during his summation.  Dkt. No. 1.  For the reasons which follow, it is recommended

that the petition be denied.

## I. BACKGROUND

The background was thoroughly summarized by the Appellate Division as follows:

[Petitioner's] convictions . . . stem from a June 18, 2001 afternoon home invasion in
which [Petitioner], accompanied by at least two other men, unlawfully entered a
home on Lord Avenue in the Town of Brunswick, Rensselaer County, assaulting and
shooting one of the occupants . . . At the second trial, the victim testified that
[Petitioner]-who he identified in court - entered his kitchen, shoved him against the
refrigerator and then to the floor, placed a loaded gun to his head, threatened to kill
him and struck him.  In response to the victim's resistance and repeated efforts to
stand up and move the gun away from his head, [Petitioner] eventually cornered him
in the bathroom, shot him in the arm and fled with his accomplices to [Petitioner]'s
vehicle, pursued by the victim who successfully recorded all but the last number in

---

[2]  A previous trial was held in February of 2002, but was declared to be a mistrial when the
jury was unable to agree on a verdict.  Feb. 7-14, 2002 Trial Transcripts.

the license plate before it sped away and reported that information and descriptions of the vehicle and shooter to police.  One of [Petitioner's] accomplices (who had not testified at the first trial) testified that he, [Petitioner] and [Petitioner's] cousin went to the victim's house planning to commit a burglary for drugs and that [Petitioner] had hit the victim and shot him before they fled in [Petitioner's] car. [Petitioner] testified that he followed the others into the house so he would be able to make drug purchases there on his own in the future, but denied any role in the shooting or assault, testimony which was impeached on cross-examination by his testimony at the first trial that he never entered the victim's house but waited outside.

Within an hour (around 5:00 P.M.), [Petitioner] was apprehended in the City of Troy, Rensselaer County, while driving his vehicle, which was registered to him and insured in his name, and taken into custody by the State Police who provided *Miranda* warnings and transported him to their barracks.  During periodic questioning, [Petitioner] denied involvement in the home invasion but admitted that he was the only person to drive his car that afternoon and he had no alibi after approximately 3:00 P.M.  At approximately 10:00 P.M., while [Petitioner]  was being questioned, the victim viewed a photo array and indicated that the picture of [Petitioner] "looked like [the assailant]," but that he "didn't want to say exactly it was him" until he saw him in person.  Informed shortly after 10:00 P.M. that the victim had not made a positive identification from the photo array, State Police investigators-aware that [Petitioner] was on parole-decided to postpone charging him for these crimes, which were contained in an unsigned felony complaint. Instead, they continued to detain [Petitioner] and contacted his parole officer, hoping to continue his detention based on a parole violation while they further investigated these crimes.

Although there was no outstanding parole warrant, [Petitioner's] parole officer came to the State Police barracks, obtained [Petitioner's] keys, searched his residence and, upon discovering certain weapons and a beeper-possession of which constituted a parole violation-issued a notice of parole violation and signed a warrant for his arrest during the early morning hours of June 19, 2001.  This led to [Petitioner's] arrest on parole violations and transport to the county jail, where his clothing and shoes were secured by jail personnel.  Although not admitted into evidence at his first trial, at the second trial the People submitted testimony that subsequent DNA testing on these items indicated with near certainty that they contained blood from the victim and [Petitioner].  The next day, June 20, 2001, a lineup was conducted at which the victim immediately identified [Petitioner] as the shooter.  On June 22, 2001, pursuant to a search warrant, [Petitioner's] clothing and shoes were taken from the jail into custody by the State Police.  A sealed indictment was handed up approximately one month later containing the offenses for which [Petitioner] has been convicted and sentenced.

. . . .

Prior to the *first* trial ... [Petitioner] moved to suppress his oral and written statements to police and the lineup identification, and to preclude any in-court identification of him by the victim. The People stipulated not to admit [Petitioner's] clothing, as the scientific test results were not yet available. After a . . . hearing, County Court ruled that police had probable cause to take [Petitioner] into custody around 5:00 P.M. on June 18, 2001, to search his car pursuant to a search warrant, and that [Petitioner] received *Miranda* warnings and made voluntary statements to police while in custody, which were admissible. However, the court held that when the State Police, upon learning of the inconclusive results of the photo array (around 10:00 P.M.), made the decision not to charge [Petitioner] with these crimes, "there was no legal basis to hold [Petitioner]." Thus, [Petitioner's] detention thereafter became illegal and "any fruits as a result of that illegal custody must be suppressed." Further, while suppressing the lineup identification made during the illegal detention, the court found that the victim had a sufficient independent basis for identifying [Petitioner] "based upon his clear observation of [Petitioner]" during the crime, and permitted the victim to make an in-court identification.

After the first trial ended in a mistrial, the People sought permission to admit into evidence at the second trial [Petitioner's] clothing and the results of the DNA testing. [Petitioner] opposed, arguing that the clothing should be suppressed as the product of his illegal detention, i.e., the fruits of the poisonous tree. After a . . . hearing, County Court denied [Petitioner's] motion to suppress this evidence ruling that the search warrant was supported by sufficient reasonable cause, even without the tainted and suppressed lineup identification. The court also rejected [Petitioner's] claim that the clothing must be suppressed as the fruit of the poisonous tree, finding that the prior police illegality-i.e., the June 19, 2001 illegal detention-had been "attenuated" by the subsequent attainment of a valid search warrant which was supported by sufficient untainted evidence, relying on the attenuation factors discussed in *People v. Harris*, 72 N.Y.2d 614, 620, 536 N.Y.S.2d 1, 532 N.E.2d 1229 [1988], *revd.* 495 U.S. 14, 110 S.C. 1640, 109 L.Ed.2d 13 [1990].

*Richardson*, 9 A.D.3d at 784-86 (emphasis in original).

## II. DISCUSSION

**A.    Applicable Standard of Review**

When reviewing a habeas petition, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States. 28 U.S.C. § 2241(c) (2006). Relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *DiGuglielmo v.*

*Smith*, 366 F.3d 130, 136-137 (2d Cir. 2004).   Under the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), a federal court may not grant habeas relief to a state prisoner on a claim

that was adjudicated on the merits in state court proceedings unless the state court's decision was

"contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court."  28 U.S.C. § 2254(d)(1) (2006); *Carey v. Musladin*, 127 S. Ct.

649, 653 (2006); *Campbell v. Burgess*, 367 F. Supp. 2d 376, 380 (W.D.N.Y. 2004).

       A decision is adjudicated "on the merits" when it finally resolves the claim, with res judicata

effect, based on substantive rather than procedural grounds.  *Sellan v. Kuhlman*, 261 F.3d 303,

311-12 (2d Cir. 2001).  This is so, "even if the state court does not explicitly refer to either the

federal claim or to relevant federal case law."  *Id.* at 312.  To determine whether a state court has

adjudicated a claim "on the merits," a federal habeas court must examine three "clues" to classify the

state court decision as either (1) fairly appearing to rest primarily on federal law or to be interwoven

with federal law; or (2) fairly appearing to rest primarily on state procedural law.[3]  *Jimenez v.

Walker*, 458 F.3d 130, 145 (2d Cir. 2006).  "Absent a clear and express statement of reliance on a

state procedural bar," decisions in the first category are deemed to have been made "on the merits"

of the federal claim.  *Id.*

       A decision "on the merits" is "contrary to ... clearly established federal law" when it is

"either contrary to Supreme Court precedent on a question of law or ... opposite to a relevant

Supreme Court case with 'materially indistinguishable' facts."  *Johnson v. West*, No. 9:04-CV-751,

2007 WL 952058 at *2 (N.D.N.Y. Mar. 29, 2007), quoting *Williams v. Taylor*, 529 U.S. 362,

_____

       [3]  The three "clues" to the basis of a state court's decision are (1) the face of the state court
opinion; (2) whether the state court was aware of a procedural bar; and (3) the practice of state
courts in similar circumstances.  *Jimenez*, 458 F.3d  at 145, n. 16.

405-406 (2000).  A state court unreasonably applies federal law when the state court correctly

identifies the governing legal rule in a particular case but applies the rule to the facts in an

"objectively unreasonable" manner.  *Johnson*, 2007 WL 952058 at *2 (quoting *Lockyer v. Andrade*,

538 U.S. 63, 75 (2003)).  Although "[s]ome increment of incorrectness beyond error is required" in

order to grant a federal habeas application, that increment "need not be great; otherwise, habeas

relief would be limited to state court decisions 'so far off the mark as to suggest judicial

incompetence.'"  *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000); *see also Hawkins v.

Costello*, 460 F.3d 238, 243 (2d Cir. 2006).  The state court's determination of a factual issue is

presumed to be correct, and the petitioner has the burden of rebutting that presumption by clear and

convincing evidence.  28 U.S.C. § 2254 (e)(1) (2006); *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d

Cir. 2005), *cert. denied* 546 U.S. 884 (2005); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001).

## B.     Fourth Amendment Claim

Petitioner contends that the seizure of his clothes constituted a violation of his Fourth

Amendment rights.  Petition at p. 5, Grounds 1 & 2; Traverse at pp. 8-14.  Respondent argues that

Petitioner's claim is not cognizable on federal habeas review and should be dismissed.  Memo. of

Law at pp. 18-19.

In this Circuit, the merits of a Fourth Amendment claim asserted in a federal habeas petition

may only be properly reviewed by a district court where: (1) the state has provided no corrective

procedures to redress the alleged Fourth Amendment violations or (2) the state has provided a

corrective mechanism, but the petitioner was precluded from availing himself of such procedure due

to an unconscionable breakdown in the underlying process.  *Capellan v. Riley*, 975 F.2d 67, 70 (2d

Cir. 1992) (citing *Stone v. Powell*, 428 U.S. 465, 481-82 (1976)); *see also Campbell v. Greene*, 440

F. Supp. 2d 125, 138 (N.D.N.Y. 2006) (McCurn, J.).  States are required only to provide "an *opportunity* for full and fair litigation of a fourth amendment claim." *Capellan*, 975 F.2d at 71 (emphasis in original).

New York State has provided an opportunity for criminal defendants to fully and fairly litigate Fourth Amendment claims.  *See* CPL § 710; *Capellan*, 975 F.2d at 70 n.1 ("'[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'") (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)); *Jackson v. Lacy*, 74 F. Supp. 2d 173, 176 (N.D.N.Y. 1999) (McAvoy, C.J.) (adopting Report-Recommendation of Magistrate Judge Ralph W. Smith, Jr.).  Specifically, under the CPL, a criminal defendant may move to suppress evidence he believes was unlawfully or improperly obtained where the defendant "has reasonable cause to believe that such [evidence] may be offered against him in a criminal action."  See CPL § 710.20.  Where the state has provided a mechanism to correct Fourth Amendment violations, a "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process."  *Capellan*, 975 F.2d at 72.  Rather, an "unconscionable breakdown" requires the "disruption or obstruction of a state proceeding."  *Id.* at 70.

In his petition, Petitioner does not and cannot claim that New York fails to provide corrective procedures for violations of Fourth Amendment rights.  As mentioned above, CPL Section 710 enables defendants to move for a hearing to suppress evidence obtained in an unlawful arrest.  Petitioner availed himself of that procedure by making a motion to suppress, *inter alia*, the clothing, arguing that the search warrant application relied upon the improper lineup identification that was previously suppressed.  *See* State Court Records, Ex. A.  The hearing court denied the

motion to suppress the clothing on the basis that the search warrant was supported by sufficient reasonable cause, even without the suppressed lineup identification. *Id.* The hearing court also rejected Petitioner's argument that the clothing must be suppressed as the fruit of the poisonous tree, finding that the illegal detention had been attenuated by the subsequent attainment of a valid search warrant that was supported by sufficient untainted evidence. *Id.* The Appellate Division found that suppression of the clothing was not required, albeit on a different basis than the hearing court. *Richardson*, 9 A.D.3d at 788. Accordingly, Petitioner utilized his opportunities to litigate his Fourth Amendment claim.

Petitioner argues that there was an unconscionable breakdown in the state's corrective process. Traverse at pp. 8-14. Petitioner disputes the state courts' rulings and claims that he should have been given an opportunity to explain why certain cases cited in the Appellate Division's decision were inapplicable. *Id.* However, such disagreement "is not the equivalent of an unconscionable breakdown in the state's corrective process." *Capellan*, 975 F.2d at 72 ("a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process."); *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977) ("*Stone v. Powell* ... holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts."), *cert. denied* 434 U.S. 1038 (1978).

Even if the state courts erred in their analysis of the merits of Petitioner's Fourth Amendment claim, that is not enough to warrant habeas review. *Steinbergin v. Barkley*, No. 05 Civ. 6565, 2007 WL 1987953, *4 (S.D.N.Y. Jul. 9, 2007)(citing *Capellan*, 975 F.2d at 71). *See Crenshaw v. Superintendent, Five Points Corr. Fac.*, 372 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (finding

petitioner's "assertions that the state courts were incorrect and defense counsel incompetent do not constitute the sort of 'breakdown' referred to in *Gates v. Henderson*" that would permit habeas review of a Fourth Amendment claim), *reconsideration denied* 595 F. Supp. 2d 224 (W.D.N.Y. 2009).

Further, to the extent that this claim is based upon a disagreement with the state courts' factual findings, they are entitled to a presumption of correctness and Petitioner has failed to overcome that presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003), *cert. denied* 540 U.S. 1091 (2003).

Accordingly, Petitioner's claim should be denied.

**C.    In-Court Identification**

Petitioner argues that there was no independent basis to support the victim's in-court identification of Petitioner. Petition at p. 6, Ground 3; Traverse at pp. 4-7. Respondent claims that the Appellate Division rejected this claim, and that the determination was neither contrary to, nor based on an unreasonable application of, established Supreme Court law. Memo. of Law at pp. 11-17.

> While a suggestive pre-trial identification procedure "does not in itself intrude upon a constitutionally protected interest," *Manson v. Brathwaite*, 432 U.S. 98, 113 n. 13 (1977), a defendant's right to due process includes the right not to be the object of "irreparable misidentification" at trial. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir.1998). Courts thus undertake a two-part inquiry to determine the constitutionality of the admission of a witness's in-court identification of a defendant. First, the court must examine "whether the circumstances surrounding the witness'[s] pre-court identification were unduly suggestive of the suspect's guilt." *Styers v. Smith*, 659 F.2d 293, 297 (2d Cir.1981). If the identification procedures were unduly suggestive, then the court must assess whether "a threshold level of reliability can be established through evidence that is independent of the suggestive procedure."

9

> *Dunnigan*, 137 F.3d at 128. As "reliability is the linchpin in determining the admissibility of identification testimony," *Brathwaite*, 432 U.S. at 114, "[e]ven grossly suggestive procedures will not require suppression of a witness'[s] identification testimony if it is clearly reliable, independent of improper procedures." *Styers*, 659 F.2d at 297.

*Mathieu v. Giambruno*, No. 05 Civ. 8098, 2008 WL 383509, at *13 (S.D.N.Y. Feb. 11, 2008).

A court must consider five factors when evaluating the reliability of an identification, including 1) the opportunity of the witness to view the criminal at the time of the crime; 2) degree of attention; 3) the accuracy of the witness' prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200; *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

First, the circumstances surrounding the victim's pre-court identification of Petitioner were not unduly suggestive of Petitioner's guilt. The lineup was suppressed because it was the product of an illegal detention and not because it was tainted by suggestiveness. *See* Hearing Tr.[4] at pp. 47-48.

Second, the victim's in-court identification of Petitioner had an independent basis.

### 1.    Opportunity of the Victim to View Petitioner at the Time of the Crime

The victim had ample opportunity to view Petitioner during the crime. The victim testified at the suppression hearing that Petitioner's face was clearly visible the entire 2 ½ minutes that Petitioner was in the victim's residence. Hearing Tr. at p.16. The victim stated that after speaking briefly with Petitioner and others at the back door of his residence, the victim was pushed back into the kitchen by Petitioner, forcing the victim against a refrigerator. *Id.* at p. 7. The victim noted that

---

[4] References to the "Hearing Transcript" are to the transcript of the suppression hearing held on February 6, 2002.

the kitchen was well lit, stating that all of the window curtains were up and it was a sunny afternoon. *Id.* at pp. 7-8.

The victim stated that Petitioner then cocked his gun and placed it against the victim's head. Hearing Tr. at p. 8. Petitioner then "smacked" the victim in the face with the gun, causing the victim to fall backward on to the floor. *Id.* at p. 9. The victim stated that during this time he and Petitioner looked eye-to-eye and that Petitioner was "right in front" of the victim, approximately an "arm's length" away. *Id.* At that point, the victim observed that Petitioner's build was "stocky" and "big." *Id.* at p. 10.

The victim stated that he then stood up and looked at Petitioner, who was "just a couple [of] feet away" away from the victim. Hearing Tr. at pp. 10-11. Petitioner looked at the victim with an enraged look on his face. *Id.* at pp. 10-11.

The victim was struck again, falling in front of the bathroom doorway. Hearing Tr. at p. 11. The victim stated that the light was on in the bathroom. *Id.* At that point, Petitioner stood over the victim, threatened to kill him, and repeatedly attempted to place his gun against the victim's head. *Id.* at pp. 11-13. During this time, the victim and Petitioner "kept looking at each other right in each others['] faces." *Id.* at p. 12. Petitioner then shot the victim in the arm. *Id.* at pp. 12-13. The victim looked at Petitioner and stated, "'You mother fucker, you shot me.'" *Id.* at p. 13. The victim clearly observed Petitioner's face when he made this statement. *Id.*

The victim stated that Petitioner wore nothing on his head except for a "do rag" over his hair. *Id.* The victim stated that Petitioner "was right in front of me the whole time" and that the victim had no interaction with Petitioner's accomplices. *Id.* at p. 14. In sum, the victim had ample opportunity to view Petitioner during the crime.

11

**2.      Degree of Attention**

The victim's description of Petitioner reveals a high degree of attentiveness throughout the incident.  In addition to providing a detailed account of the incident, which included reporting most of the characters of Petitioner's license plate, 06/14/02 Trial Tr. at pp. 65-67, the victim provided a description of Petitioner's physical appearance.  He observed that Petitioner was the largest of the men who entered his residence.  Hearing Tr. at pp. 6-7.  He described Petitioner as black, and approximately 6' 2" tall in height and 230 pounds in weight.  *Id.* at p. 6.  The victim stated that he initially noticed that Petitioner was "stocky," and was unsure if Petitioner "worked out," but stated that Petitioner was "big."  *Id.* at 10.  The victim also noticed that Petitioner wore a "do rag" on his head.  *Id.* at 13.

The victim also testified that he had no interaction with Petitioner's accomplices.  Hearing Tr. at p. 14.  He stated that he focused and "concentrated" on Petitioner because he was "right in my face" and the other two individuals were "directly behind" Petitioner "the whole time."  *Id.*  The victim even spoke to Petitioner after Petitioner shot him in the arm, looking directly at Petitioner. *Id.* at p. 13.

The victim testified that he had 20/20 vision and had consumed no alcohol or drugs that day. Hearing Tr. at p. 14.  He further stated that he had a good night's sleep the night before the incident and was thinking clearly on the date of the incident.  *Id.*  Accordingly, the victim was not a "casual or inattentive observer."  *See Mathieu*, 2008 WL 383509, at *14 (citing *Dunnigan*, 137 F.3d at 129).

Petitioner argues that the victim was unreliable because he never mentioned whether

12

Petitioner had facial hair.[5]  Petition at p. 6.  Petitioner claims that he had full facial hair at the time. *Id.*  This argument is unpersuasive.  The victim's description of Petitioner was thorough.  Moreover, there is no requirement that a witness must indicate whether an attacker had facial hair, and if so, describe the fullness of the facial hair.  *See Mathieu*, 2008 WL 383509, at *14 (finding meritless the petitioner's argument that the victim's descriptions of her attacker were flawed because the victim could not recall certain facial features such as facial hair).

Petitioner also apparently argues that the victim was unreliable because the victim told his stepdaughter that four individuals were involved in the crime instead of three individuals, which was the number of individuals that the prosecution claimed were involved in the incident.  Petition at p. 6.  This argument is unpersuasive.  The discrepancy, if any, in the number of perpetrators in no way undermines the degree of attention the victim paid to Petitioner.  As the victim stated, he interacted solely with Petitioner and concentrated only on Petitioner.  Hearing Tr. at p. 14.

### 3.    Accuracy of the Victim's Prior Description of Petitioner

The victim's description of Petitioner was fairly consistent with Petitioner's appearance.  The victim described Petitioner as a black male, who was approximately 6' 2" tall in height and 230 pounds in weight.  Hearing Tr. at p. 6.  Petitioner argues that this description was inaccurate. Traverse at pp. 4-7.  Petitioner claims that the record reveals that he is approximately 5'5" or 5'6" and weighs 300 pounds.  *Id.* at p. 5.  However, on appeal, Petitioner's appellate counsel argued that Petitioner is 5'8."  State Court Records, Ex. B, at p. 7.

"Identifications may be accurate overall, while being inaccurate as to height, particularly

---

[5]  Respondent argues that Petitioner never raised this specific claim regarding facial hair in the Appellate Division.  Memo. of Law at p. 16.  However, a review of Petitioner's Appellate Division brief reveals that this specific argument was raised.  State Court Records, Ex. B at pp. 7-8.

where a person is observed in motion and in different activities, and from different vantages and heights." *Cannon v. Graham*, No. 06 Civ. 1175, 2006 WL 3486803, at *6 (S.D.N.Y. Oct. 31, 2006) (holding that witness's error in estimating the defendant's height did not make his identification unreliable). Here, the victim observed Petitioner in motion and from several different vantage points. The victim initially observed Petitioner when Petitioner was at the back door of the victim's residence, however the victim was quickly pushed into the kitchen by Petitioner. Hearing Tr. at p. 7. The victim stated that Petitioner then "smacked" the victim in the face with the gun, causing the victim to fall backward on to the floor. *Id.* at p. 9. The victim stood up, only to be struck again, falling on the floor. *Id.* at p. 11. Petitioner then stood over the victim and attempted to place his gun against the victim's head, subsequently shooting the victim in the arm. *Id.* at pp. 11-13. Thus, while the victim's estimation of Petitioner's height may have been inaccurate, the victim observed Petitioner in motion and from different vantages, including from the ground. Accordingly, the victim's estimation of Petitioner's height does not render the identification inaccurate.

As to Petitioner's weight, the victim estimated that Petitioner weighed 230 pounds. Hearing Tr. at p. 6. However, Petitioner claims that he weighed 300 pounds. Traverse at p. 5. Respondent argues, in a footnote, that Petitioner "may well have appeared to be lighter than [300 pounds]." Memo. of Law at p. 15, n. 9. While the victim's estimate of Petitioner's weight may have been inaccurate, again, the victim observed Petitioner in motion and from different vantages, including from the ground. Therefore, the victim's estimation of Petitioner's weight does not render the identification inaccurate. *See Dunnigan v. Keane*, 137 F.3d 117, 130 (2d Cir. 1998) (finding that witness's miscalculation of defendant's weight was insubstantial "given that, while in the witness's presence, the defendant was not standing still but was squatting, running, or sitting), *cert. denied*

525 U.S. 840 (1998).[6]

### 4.    The Level of Certainty Demonstrated by the Witness

The night of the incident, the victim viewed six photographs.  Hearing Tr. at p. 16.  He stated that he recognized Petitioner's face in a photograph, but wanted to see Petitioner's whole body before making a positive identification.  *Id.* at 16, 24.  The next day during the lineup, the victim positively identified Petitioner.  *Id.* at pp. 16-19.  The victim later identified Petitioner at both trials.  02/07/02 Trial Tr. at p. 57; 06/14/02 Trial Tr. at p. 47.

Petitioner asserts that he had no counsel during the lineup and speculates that the police officers may have asked the victim "if the man he observed in the photograph was in the lineup." Traverse at p. 5.  There is no evidence to support this bare speculation.  Moreover, the victim testified that the police officers said nothing to him as to whether a suspect was in the lineup. Hearing Tr. at p. 23.  Furthermore, the victim stated that he recognized Petitioner in the lineup based upon what occurred at the victim's house, and not based upon seeing Petitioner's face in a photograph.  *Id.* at p. 26.

### 5.    The Length of Time Between The Crime and The Confrontation

The length of time between the crime and the victim's identifications was not so great as to make it likely that the victim forgot what Petitioner looked like.  The victim identified Petitioner at the first trial, approximately eight months after the crime occurred.  Although it had been nearly one year since the crime when the victim identified Petitioner at the second trial, identifications made after far greater intervals have been found reliable, particularly where, as here, there were other

---

[6] Petitioner's claim that the victim's description more accurately fits another individual whom Petitioner claims was the actual shooter, "Mr. Frost," Traverse at p. 4, is speculative and unsubstantiated.

strong indicia of reliability.  *See United States v. Kwong*, 69 F.3d 663, 666 (2d Cir. 1995) (finding

an identification made five years after the crime reliable), *cert. denied*, 517 U.S. 1115 (1996).

In sum, the victim's in-court identification of Petitioner was properly admissible because it

was sufficiently reliable independent of the lineup.  Similarly, the Appellate Division determined

that there was an independent basis for the victim's in-court identification of Petitioner, as follows:

> The victim's testimony at the suppression hearing provided clear and convincing
> evidence to establish that he had an unobstructed and "eye to eye" view of defendant
> for several minutes in the well-lit kitchen during which his attention was
> continuously and exclusively focused on defendant, amply supporting the court's
> determination that the victim's in-court identification had an independent source,
> untainted by police procedures.  Further, in the hours after the crime, while not
> making a positive identification, the victim had selected defendant's photo (taken the
> day of the crime) as the one which "looked like the assailant," requesting to see his
> whole body in person to be sure, and indicating that he knew he could identify him if
> he saw him in person.  The subsequent lineup was not tainted by suggestiveness but,
> rather, was suppressed as the product of an illegal detention.  Defendant's reliance
> upon the discrepancy between the victim's initial estimation of his assailant's height
> and weight and defendant's actual measurements is improperly premised upon trial
> evidence and, in any event, does not undermine the court's independent source
> determination.

*Richardson*, 9 A.D.2d at 786-77 (citations omitted).

The Appellate Division's determination was not contrary to, or based on, an unreasonable

application of clearly established Supreme Court law.  Accordingly, this ground of the petition

should be denied.

**D.     Prosecutorial Misconduct**

Petitioner claims that the prosecutor committed misconduct by accusing Petitioner of lying

and by invoking God during his summation.  Petition at p. 6, Ground 4; Traverse at pp. 15-21.

Specifically, Petitioner argues that the prosecutor was "desperate" to obtain a guilty verdict,

therefore the prosecutor made the following "unethical" statements during his summation, Traverse

at pp. 18-19:

(1)  [Defense counsel] said to you in his opening, "ask yourself what is missing here. What is missing here?"  Well, if we are going to talk about crimes contained in the indictment here, there is nothing missing here.  If we are going to talk more abstractly, what is missing is the truth from the defendant.  That is what was missing. The truth.  06/21/02 Trial Tr. at p. 65.

(2)  That is certainly something you should consider, frankly, defendant's temperament that he can stand, walk up to the clerk and go, "I swear to tell the truth so help me God," raise his right hand, walk around, take a seat, look fourteen people in the eye here to determine what the facts are and then lie to them about the facts. Don't ever forget that."  *Id.* at p. 67.

(3)  [W]e know about the third person in the house, the other black male, of course depending on which version Mr. Richardson wants to tell you this week, we don't know who that is exactly.  *Id.* at p. 68.

(4)  In sum and substance what he is saying Investigator Aiken without getting too personal, is about simple lie, not going to threaten anyone he is not big [sic].  *Id.* at p. 73.

(5)  Well then [defendant] makes the other big mistake, lies to Investigator Aiken. Tells him some of the truth.  "My car, no one else had it today."  And then he says, "no one can alibi me after three o'clock."  Well that is a lie.  It is a lie.  He starts lying immediately [on] June 18, 2001.  *Id.* at p. 74.

(6)  [Defendant] [d]oesn't mention anything about this mysterious character he has made up [to the state police on June 18].  Doesn't mention him.  Why, quite frankly, I don't mean to insult him, but maybe he is not bright enough, didn't think it through enough yet.  I don't know, he wasn't quick enough to start churning the lies out on June 18th.  Not only did he wait until February to lie under oath the first time, well again, I am going to come back to that near the end.  *Id.* at pp. 74-75.

(7)  [O]f course, Frost is wearing dark pants, of course, because that is [the victim's] description too.  Defendant wants to, he wants to make Frost look obviously as close to [the victim's] physical description as humanly possible.  What is the description defendant gave of Frost?  Oh, yes, six-two.  Six-two of course because that is what [the victim] wrote in his written deposition that he gave State Police on June 18th. *Id.* at pp. 76-77.

(8)  I am not even going to nit pick his lies right now, I stopped counting them on Wednesday.  Off the top of my head I don't know how many times he lied

17

Wednesday, do you?  *Id.* at p. 196.

(9)  [M]y next question [to defendant] was: "If you are telling the truth, which of course we know you weren't, but if you are telling the truth, why do you need to appear to be credible, why would you be concerned with that?  We all know what he is doing, he is tailoring his testimony to fit the physical evidence.  *Id.* at p. 78.

(10) [T]hat is inconsistent with his own testimony Wednesday, you know, because now there is not a driver waiting out in the car because now that we have him in the house he again conforms his testimony to the physical evidence.  He changes.  You know what, he doesn't have any idea what the truth is.  That is the bottom line.  *Id.* at p. 79.

(11) Now it is [defense counsel's] description of him, when he got a copy of the blood report, or DNA was like - - let me look for my notes.  "Oh shit, now I am in the house.  What do I say now?"  Let's concoct a new story, to use [defense counsel's] words Wednesday, what is the truth today for him.  That is what he wants you to believe.  *Id.* at p. 84.

(12) Finally, defendant lies.  We know that.  He told you that.  There isn't any interpretation of what the testimony was.  He said to you he lied last time and, "yes, I lied last time."  He has lied before.  Lied to you again on Wednesday.  Why did he lie to you?  Because the truth is he shot [the victim].  *Id.* at p. 85.

06/21/02 Trial Tr.

Respondent argues that Petitioner's claim is procedurally barred and, in any event, is without

merit.  Memo. of Law at pp. 20-24.

Generally, a federal court may not reach the merits of a petitioner's habeas claim if the state

courts' rejection of the petitioner's federal claim rested "on a state law ground that is independent of

the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722,

729 (1991).  "To determine whether a state procedural bar is adequate to support the judgment, a

federal habeas court should look to whether the state rule at issue is firmly established and regularly

followed."  *Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. 2008), *cert. denied* 129 S. Ct. 130 (2008).

When the state court bases its decision on an independent and adequate state procedural bar, a

18

petitioner may only seek habeas review if he or she shows "cause for the default and prejudice resulting therefrom." *Levine v. Commissioner of Correctional Services*, 44 F.3d 121, 126 (2d Cir. 1995).  The Second Circuit has held that New York's preservation rule, which precludes appellate review of an issue if a criminal defendant fails to contemporaneously object to the alleged legal error at trial, is firmly established and regularly followed, and thus qualifies as an "adequate and independent state ground." *Richardson v. Greene*, 497 F.3d 212, 217-220 (2d Cir. 2007).

On appeal, Petitioner's appellate counsel argued that the prosecutor had committed misconduct by making the above-cited remarks.  State Court Records, Ex. B, at pp. 19-22.  The Appellate Division found that this claim was "unpreserved but, in any event, ha[s] been examined and determined to lack any merit." *Richardson*, 9 A.D.3d at 790.

The Court finds that the Appellate Division's decision that this claim was unpreserved constitutes an adequate and independent state law ground.  Therefore, Petitioner's claim is procedurally barred.  Moreover, Petitioner has not established cause for the default and actual prejudice, or that the a fundamental miscarriage of justice would result.

Even if Petitioner's claim was not procedurally barred, the Appellate Division's determination that Petitioner's claim is without merit was not contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

A petitioner may obtain habeas relief based on a claim of prosecutorial misconduct during summation only if the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  To meet his burden, Petitioner "must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in

determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994), *cert. denied* 516

U.S. 1152 (1996).  Three factors are considered by a habeas court in determining whether a

prosecutor's summation created actual prejudice: " 'the severity of the misconduct; the measures

adopted to cure the misconduct; and the certainty of conviction absent the improper statements.' "

*Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting *Floyd v. Meachum*, 907 F.2d 347,

355 (2d Cir. 1990) (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1982)(per

curiam), *cert. denied* 456 U.S. 989 (1982)).  The court "must evaluate the challenged remarks in the

context of the trial as a whole, for the government is allowed to respond to argument that impugns

its integrity or the integrity of its case." *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994).

*See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (finding no substantial prejudice, in part

because "[m]uch of the objectionable content was invited by or was responsive to the opening

summation of the defense") (citing *United States v. Young*, 470 U.S. 1, 13 (1985)).  *See Walker v.*

*Cunningham*, No. 08-CV-2735, 2008 WL 4737664, at *5 (E.D.N.Y. Oct. 28, 2008)("A prosecutor

has broad latitude during summation, particularly when responding to defense counsel's

summation.").

## A.    Severity of the Prosecutor's Conduct

The prosecutor's characterization of portions of Petitioner's testimony as lies, which the

prosecutor tied to the pertinent evidence of record, was not a misstatement of the evidence.

Petitioner admitted that he lied several times at the first trial, and that he lied to a police

investigator.  *See* 06/19/02 Trial Tr., at pp. 65-66, 94-95, 121-31, 137-46.  *See Darden*, 477 U.S. at

181-182 (prosecutor's summation did not render trial fundamentally unfair where prosecutor did not

manipulate or misstate the evidence).  Petitioner even admits in his petition that he lied.  Petition at

p. 6.

Moreover, the prosecutor's comments were made in response to defense counsel's summation.  In his summation, defense counsel discussed at length the fact that Petitioner had lied, stating "[Petitioner] told you that he lied before.  He lied to [the police investigator] and he lied . . . in the courtroom before another jury . . . [Y]ou may even be thinking this yourselves, 'Someone who lied under oath is not worthy of belief.'  Evidence points to him and he is a liar.  That is it, simple."  *See* 06/21/02 Trial Transcript, at p p. 52-53; *see also id.* at pp. 59-63.  Defense counsel also stated on at least three occasions that he "wish[ed]" Petitioner had not lied.  *Id.* at 60. Moreover, defense counsel repeatedly questioned the veracity of several of the People's witnesses, including the victim, using the words "lie," "lied," and "liar" on numerous occasions, and referred to two of the People's witnesses as "blatant liars."  *See id.*, at pp. 15-17, 31-32, 37, 44, 47, 53-54. Therefore, the prosecutor's remarks were in response to defense counsel's summation.

Petitioner also argues that the prosecutor invoked "God" in an attempt to appeal to the jury's emotions and religious beliefs.  Petition at p. 6.  However, the prosecutor's reference to God occurred when the prosecutor simply quoted the oath that Petitioner took at his first trial before he admittedly lied to that jury.  06/21/02 Trial Tr. at p. 67.  Thus, this claim is unavailing.

Moreover, Petitioner admits that no objection to the comments was made during trial. Traverse at p. 16.  The Second Circuit has held when there is no objection, "reversal is warranted only where the remarks amounted to a 'flagrant abuse.' " *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002) (quoting *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir.1998)), *cert. denied*, 525 U.S. 1083 (1999)). The isolated comments about which Petitioner complains cannot be characterized as "flagrant abuse" and "do not come within hailing distance of prejudice." *Coriaty*,

300 F.3d at 255.

### B.    Measures Adopted to Cure Any Misconduct

The trial court dissipated any adverse effects of the prosecutor's comments through its jury instructions.  Before the jury heard opening statements, the trial court instructed the jury, "It will be your duty to find, from the evidence, what the facts are.  You and you alone are the judges of the facts."  06/14/02 Trial Tr. at p. 6.  The court also instructed the jury that "[c]ertain things are not evidence and must not be considered by you . . . [including] [s]tatements, arguments and questions by the lawyers."  *Id.* at p. 7.  The court further told the jury that statements made by counsel during summations do not constitute evidence.  *Id.* at p. 9.

During the final jury instructions, the court twice told the jury that they were the "sole and exclusive judges of the facts."  06/21/02 Trial Tr. at pp. 88, 90.  The court also reminded the jury to consider only the evidence when deliberating, and that they "are the sole and exclusive judges of the credibility of the witnesses."  *Id.* at pp. 88-90.  Further, the court instructed the jury that "it is not counsel nor the Court's recollection [of the evidence] that is controlling, but your collective recollection."  *Id.* at p. 103.  The jury is presumed to have followed the trial court's instructions. *See Charlemagne v. Goord*, No. 05 Civ. 9890, 2008 WL 2971768, at *24 (S.D.N.Y. June 30, 2008) (jury presumed to follow instruction that it was their own recollection of the evidence that controlled and it was free to accept or reject counsel's arguments).

### 3.    Certainty of the Conviction

The evidence against Petitioner was very strong.  The victim's in-court identification of Petitioner was corroborated by one of Petitioner's accomplices.  The accomplice testified that Petitioner drove the vehicle to the victim's residence, entered the residence, "pistol whipped" the

victim, and shot the victim.  06/17/02 Trial Tr. at pp. 11-21.  Moreover, the victim remembered and wrote down most of Petitioner's license plate number even after the victim had been shot.  06/14/02 Trial Tr. at pp. 65-67.  Further, DNA evidence revealed that blood on the Petitioner's clothing was consistent with the victim's DNA.  06/18/02 Trial Tr. at pp. 176-79.  The absence of the alleged prosecutorial misconduct would not have affected the certainty of Petitioner's conviction.  This is not a case in which "the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury."  *Tankleff*, 135 F.3d at 253.

In sum, the prosecutor's summation did not deprive Petitioner of a fair trial.  Moreover, the Appellate Division's determination was not contrary to, or involved an unreasonable application of, clearly established Supreme Court law.  Therefore, this claim should be denied.

**WHEREFORE**, based upon the foregoing, it is hereby

**RECOMMENDED**, that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**.  Furthermore, I find that Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right.");￼ *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).  Therefore, I recommend that no certificate of appealability issue with respect to any of Petitioner's claims; and it is further

**ORDERED**, that the that the Clerk serve copies of the electronically-available-only opinions cited herein on Petitioner.[7]

---

[7]  Those decisions include *Johnson v. West*, No. 9:04-CV-751, 2007 WL 952058 (N.D.N.Y. Mar. 29, 2007); *Steinbergin v. Barkley*, No. 05 Civ. 6565, 2007 WL 1987953 (S.D.N.Y. Jul. 9, 2007); *Mathieu v. Giambruno*, No. 05 Civ. 8098, 2008 WL 383509 (S.D.N.Y. Feb. 11, 2008);

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  September 22, 2009
       Syracuse, New York

George H. Lowe
United States Magistrate Judge

---

*Cannon v. Graham*, No. 06 Civ. 1175, 2006 WL 3486803 (S.D.N.Y. Oct. 31, 2006); *Walker v. Cunningham*, No. 08-CV-2735, 2008 WL 4737664 (E.D.N.Y. Oct. 28, 2008); and *Charlemagne v. Goord*, No. 05 Civ. 9890, 2008 WL 2971768 (S.D.N.Y. June 30, 2008).